# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3713 | **DATE** | 4/3/2001 |
| **CASE TITLE** | AGUILAR vs. ST. ANTHONY HOSPITAL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant's motion for summary judgment is granted. This action is dismissed in its entirety. Defendant's motion to strike is moot. All other pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | APR 0 4 2001 | |
| | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | docketing deputy initials | 3_ |
| | Copy to judge/magistrate judge. | 4/3/2001 | |
| JS | courtroom deputy's initials | date mailed notice | |
| | | JS | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EVA AGUILAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 3713 |
| | ) | |
| ST. ANTHONY HOSPITAL, a member of | ) | |
| CATHOLIC HEALTH PARTNERS SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |



## <u>MEMORANDUM OPINION AND ORDER</u>

JAMES F. HOLDERMAN, District Judge:

Plaintiff Eva Aguilar filed a three-count second amended complaint against defendant St.

Anthony Hospital, member of Catholic Health Services, alleging discrimination on the basis of

nation origin and retaliation for asserting statutory rights in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>. Defendant filed a motion for summary judgment pursuant

to Federal Rule of Civil Procedure 56, arguing that the undisputed facts present no violation of Title

VII. For the following reasons, defendant's motion for summary judgment is GRANTED.

1

# STATEMENT OF FACTS[1]

## I.    Background and Parties

Plaintiff Eva Aguilar as a Mexican-American female former employee of defendant St.

Anthony Hospital ("St. Anthony"), a member of Catholic Health Services.  Plaintiff first began

working at St. Anthony in July of 1987 as a secretary in the marketing division.  Plaintiff then

worked as a secretary in the nursing administration office from January 1988 through September 9,

1990, and as a secretary in the Department of Psychiatry from September 1990 through September

1991.  In approximately September 1991, plaintiff became a mental health worker in the Department

of Psychiatry at St. Anthony.  In late 1996, plaintiff switched from working full-time as a mental

health worker to working part-time, a minimum of 20 hours per week.  In October 1998, plaintiff's

supervisor, Carmie Amezcua, approved plaintiff's return to full-time employment as a mental health

worker.

Plaintiff's former supervisor, Amezcua, is the Clinical Nurse Manager in the Department of

Psychiatry, and has held that position since 1995 or 1996.  In that role, Amezcua is responsible for

supervising the psychiatric unit nursing staff for all three shifts.  Approximately 55 to 60 employees

report to her, including R.N.s, L.P.N.s, mental health workers, activity therapists, and a secretary.

Amezcua is not Mexican-American, but her husband is Mexican-American, and she speaks Spanish.

Plaintiff has been under the direct supervision of Amezcua since 1996.

## II.    Plaintiff's Performance Evaluations and Probation

Prior to coming under the direct supervision of Amezcua, plaintiff consistently received job

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) and 56.1(b)
statements of material facts and accompanying exhibits.

performance evaluations which rated her as "exceeds expectations." In her annual evaluations for the years 1997, 1998, and 1999, plaintiff received an overall performance evaluation with a total score of 2.00, 2.04, and 2.05, respectively, putting her in the "meets expectations" category for those years. On February 22, 2000, plaintiff received a performance evaluation with a total score of 1.87, a rate reflecting that plaintiff did not meet standards. After receiving the February, 2000 evaluation, plaintiff expressed disagreement with her evaluation and attached several letters from co-workers which indicated that plaintiff did not have problems communicating with staff members and was a valued worker.

Amezcua testified that during the last one and one-half years plaintiff was employed at St. Anthony (since approximately February 1999), Amezcua experienced recurring problems with plaintiff with regard to her rigid treatment of patients, which Amezcua considered to be non-therapeutic and detrimental to the team providing patient care on the unit. Amezcua also reported experiencing problems with plaintiff with regard to her difficulty in communicating with her manager and other team members. From 1999 through August 2000, Amezcua received complaints from other staff regarding plaintiff's behavior on an "almost weekly" basis. Those problems are reflected in plaintiff's discipline record. Catholic Health Partners has a two-track disciplinary process which involves both coaching for performance improvement and corrective action. Plaintiff's discipline record includes the following entries.

- July 8, 1997, August 14, 1997, July 16, 1998: Step 1 -- Coaching/Corrective Action for excessive absences; January 4, 1998: Step 2 -- Corrective Action (no call no show); October 22, 1999: Step 1 -- Corrective Action for excessive absences; January 24, 2000: Step 2 -- Coaching/Corrective Action for excessive absences; February 22, 2000: Step 1 -- Coaching/ Corrective Action for excessive tardiness.

- September 22, 1998: Step 1 -- Coaching for inaccurate communication and lack of

3

problem solving.

- August 16, 1999: Step 1 -- Coaching for hostile discussion with charge nurse in public at nursing station.

- September 7, 1999: Step 1 -- Coaching for improper comments at nursing station.

- November 2, 1999: Step 1 -- Coaching for failure to follow supervisor's directions regarding linen disposal.

- January 24, 2000: Step 2 -- 90 day work performance probation.

- April 14, 2000: Step 3 -- Breach of agreement.

- May 10, 2000: Completion of performance probation.

- July 11, 2000: Step 1 -- Coaching alteration at nursing station with another nurse.

The January 24, 2000 90 day work performance probation was the result of Amezcua's advising Margaret Loisel, Vice President of Nursing, of a number of issues concerning plaintiff's performance. Loisel reviewed plaintiff's employment record, which included three prior "Step One" disciplines, and recommended that plaintiff be placed on performance probation. The stated reasons for the performance probation were plaintiff's multiple performance issues, including inadequate communication with team members, failure to complete assignments on time, complaints of patients regarding the manner in which plaintiff spoke to them, and failure to do a change of security round properly. Serena Goodavish, R.N. and Vice-President of Nursing, met with both and Amezcua and plaintiff to review the probation write-up. During that meeting, plaintiff stated that she felt she was being treated unfairly by her supervisor and that there was no basis for the probation. After the meetings, Goodavish concurred with the decision to place plaintiff on probation.

During the performance probation, plaintiff met with Goodavish and Amezcua on a weekly

to bi-weekly basis to monitor and review plaintiff's performance. According to Goodavish, when she was meeting with plaintiff and Amezcua, Goodavish observed that there was a communication problem between plaintiff and Amezcua in that plaintiff argued any point raised in regard to her performance and Amezcua would tend to become defensive. Plaintiff did not trust Amezcua, and stated in a memorandum to Goodavish on January 26, 2000: "[Amezcua] continues to focus and find ways to build a paper trail on me, so that she can justify my termination as noted in the 90 day probation form." Plaintiff also testified that she informed Goodavish that Amezcua had stated "Mexicans start trouble" early in January of 2000. Goodavish testified that during the meetings between plaintiff and Goodavish, plaintiff did not complain that Amezcua was discriminating against her on the basis of her national origin. Goodavish testified that the first time she became aware that plaintiff raised an issue of national origin discrimination was after plaintiff filed suit.

Plaintiff supplied letters from certain employees which were reviewed by Goodavish. Goodavish also met with charge nurses who oversee the unit and who directly supervise plaintiff for their input regarding plaintiff's performance. The charge nurses who worked with plaintiff advised Goodavish that plaintiff challenged anything she was asked to do, frequently went into policy books to copy policies when asked to do something to check if the request was according to policy, and that plaintiff's communication with patients was antagonistic.

On April 12, 2000, during plaintiff's 90 day probation, plaintiff was found to have been in breach of her performance probation. The April 12, 2000 breach of agreement memorandum records this breach, stating "you have exhibited the following serious performance problems." The memorandum noted that plaintiff had exhibited "an attitude and behavior which is destructive to team work" including sarcasm, refusal to accept assignments delegated by the charge nurse in a

5

positive cooperative manner, ignoring team members when they communicate with plaintiff, and being impatient and unhelpful to a new staff member. The memorandum also noted four examples of plaintiff's non-therapeutic approach to patients, including a rigid approach that patients are to be controlled instead of approached in an individual therapeutic manner, evidenced by a refusal to be helpful to patients with special food requests or allow patients to have non-dangerous personal items, refusing to view patients as customers and being critical of staff who display a positive customer service approach, a resent episode where plaintiff shouted "seizure" when a patient was having a seizure and failed to assist the patient, and angrily stating in a staff meeting that it is not important for staff to understand their own feelings and reactions towards patients. The memorandum advised plaintiff that failure to improve her performance would result in "Step Four," termination.

Goodavish continued to meet with plaintiff and Amezcua until May 10, 2000, when plaintiff completed her performance probation. In a memorandum dated May 10, 2000, Goodavish and Amezcua congratulated plaintiff on completing her performance probation, and noted that there had been no further complaints from staff or patients since their last meeting with plaintiff. The memorandum reminded plaintiff that she needed to continue to work as a team member, including communicating in a style which fosters collaboration and accepting delegation in a positive manner. The memorandum also noted that plaintiff must continue to improve her ability to work with patients in a therapeutic manner, and that the improvement in plaintiff's performance must continue and be sustained.

The next contact Goodavish had with plaintiff was when plaintiff sent Goodavish a memorandum concerning her vacation. After confirming that plaintiff's vacation had in fact been granted and that this had been announced in a staff meeting, Goodavish responded to plaintiff that

6

she was concerned about the fact that plaintiff was not directly communicating with her supervisor. Even after completing her performance probation, plaintiff would not communicate with Amezcua unless others were present or it was in writing. Lack of communication between a staff member and her clinical nurse manager jeopardizes patient care.

III.   Time Off and "Low Census Days"

In addition to paid vacation time off, the Department of Psychiatry at St. Anthony allowed mental health workers to take time off by using "low census days." Under this system, staffing patterns on patient care units fluctuate on a shift-by-shift basis depending on the patient census. Low census decisions are generally made by the charge nurse on the proceeding shift who designates which staff will be allowed to take a low census day. Amezcua is not the person who makes the decision of who will have a low census day on a day-to-day basis. Plaintiff worked on the day shift with hours of employment from 7:00 a.m. to 3:30 p.m., so that the charge nurse who would usually be making the determination as to whether plaintiff would receive a low census day was the night shift charge nurse. Plaintiff did not complain that any of the charge nurses were discriminating against her or treating her unfairly in giving her low census days. A majority of plaintiff's requests for low census days were granted, and she had the second-highest number of low census days among mental health workers on her shift.

IV.   "English Only" Memorandum

On August 25, 1999, a memorandum was issued by Goodavish to all nursing staff at St. Anthony, in all departments, regarding the importance of using English in a clinical setting. The memorandum was issued to all nursing staff employees as a result of problems which arose in a unit other than psychiatry, when use of a language other than English while rendering clinical care to

7

patients was adversely affecting team work and patient care. After the memorandum was issued, plaintiff and Sylvia Castillo, another mental health worker, were standing at the nursing desk with Amezcua when a doctor began to speak to Castillo in Spanish. Castillo testified that Amezcua stated to her that she could be fired for not speaking English. Plaintiff maintains that the comment was directed to her. Castillo understood the comment to be in reference to the August 25, 1999 memorandum.

As a result of the memorandum and the concerns it raised among the staff at the hospital, a meeting was held with Goodavish, Kathy Devine, Chief Operating Officer of the hospital, and several staff members, including Sylvia Castillo. At the meeting, it was explained that the August 25, 1999 memorandum had been issued due to problems that had been occurring with respect to nursing communications when giving reports about the condition of a patient. It was explained at the meeting that the policy required English to be used when health care providers are speaking about the care and treatment of a patient to ensure good patient care. On September 12, 1999, a memorandum of apology explaining the policy requiring English to be spoken was issued and a copy was distributed to all employees. The memorandum stated in conclusion: "when employees are on breaks or other free time, they may use any language they choose. However, for the sake of providing the best possible coordination of care for our patients, English must be used by clinical employees in all professional communication."

IV.    Plaintiff's Charges and Chronology of Events

Plaintiff filed a charge with the Equal Employment Opportunity Commission on or about April 19, 2000, and a notice of right to sue letter was issued on May 15, 2000. On or about June 29, 2000, plaintiff filed a second charge with the EEOC and notice of right to sue was issued with

8

respect to that charge on July 25, 2000. Plaintiff filed her initial complaint with this court on July 29, 2000.

Plaintiff requested to take two weeks vacation from July 23, 2000 to August 7, 2000, and the request was granted. Plaintiff did not request to take more than two weeks vacation. A policy of the hospital forbids employees from requesting more than two weeks of vacation during "prime time," defined as Memorial Day through September 15. All vacation requests must be submitted to the Director of Nursing. All requests for sick or absent time must be reported to the nursing office by 5:00 a.m., 1:00 p.m., or 9:00 p.m. for the 7:00 a.m., 3:00 p.m., and 11:00 p.m. shifts, respectively. The hospital's written policy states that the failure to adhere to the call-in policy will be followed by disciplinary action. The Policy also states that when an employee is absent for three consecutively scheduled work days without properly notifying his or her department, unless otherwise entitled to a leave under the Family Medical Leave Act, it will be considered as a voluntary resignation (job abandonment).

Plaintiff did take her scheduled vacation beginning July 23, 2000. According to plaintiff, she and her family left Chicago by car on July 21, 2000 to visit family in rural Monterey, Mexico. Plaintiff testified that on August 1, 2000, while in Monterey, she became ill and had symptoms of diarrhea, vomiting, and fever. Plaintiff's husband took her to see a doctor in a nearby town, and the doctor diagnosed plaintiff with "probable rubella." On August 5, 2000, plaintiff's husband called the hospital because, according to plaintiff, she was too weak to walk to the nearest phone. Under the hospital's policy, employees are to keep a log of "schedule changes," including sick time, in a nursing staff log book. Per that policy, Wilbeurga DeOcampo, weekend relief nursing supervisor, recorded a summary of the call from plaintiff's husband which states: "Husband called to state Mrs.

Aguilar just came back from vacation and is now sick and cannot work Monday [August 7]." DeOcampo testified at her deposition that she advised plaintiff's husband that plaintiff needed to call in. Because DeOcampo did not hear from Aguilar, DeOcampo attempted to call plaintiff at home several times during the course of her shift, but was unable to reach her. On August 7, 2000, Amezcua advised Sara Piekielny, Directory of Employment/Employee Relations for Catholic Health Partners, of plaintiff's husband's August 5, 2000 phone call. Amezcua called Piekielny instead of Loisel because Loisel was on vacation. Piekielny was aware of plaintiff's performance problems prior to that date. Piekielny testified that she advised that plaintiff be written up for a warning because she failed to follow departmental procedure for calling in.

Also on August 7, 2000, Virgilio DeRama, nursing supervisor, recorded a call from plaintiff which he recorded as follows: "1950 [7:50 p.m.] -- 8/7 -- Eva Aguilar [Mental Health Worker] -- Called from Texas. Will not be back to Chicago until Friday. Will be back to work 8/12, Saturday." Plaintiff claims that during this phone call, plaintiff asked if she needed to keep calling every day, and that DeRama said "no." DeRama testified that plaintiff did not tell him that she was sick, and that plaintiff did not ask whether she needed to call in every day. The next day Amezcua called DeRama and asked him to provide her with a written note concerning what plaintiff had stated when she called in. On either Wednesday or Thursday, DeRama sent Amezcua an e-mail documenting his conversation with plaintiff which stated: "On August 7, 2000, at 19:50, I received a call from E. Aguilar [Mental Health Worker], informing me that she is still in Texas, and will not be able to work until Saturday, August 12, 2000. She will be back in Chicago on Friday, August 11, 2000." Amezcua advised Piekielny that plaintiff had called in late in the day on Monday after the start of the second shift and talked to DeRama. Amezcua also read the information regarding the August

10

5 and August 7 phone calls from the nursing log to Piekielny. Piekielny recommended plaintiff's termination per hospital policy for failure to follow departmental guidelines for calling into work for three consecutive days. Piekielny discussed the decision with Amezcua and Goodavish, who both agreed with the decision.

On August 9, 2000, Piekielny sent a letter to plaintiff by messenger and certified mail, following the practice she always follows for terminations. Plaintiff received the letter when she returned home from her vacation on the afternoon of August 9, 2000. The letter relates the two phone log messages, and then states that plaintiff's request for a week continuance of vacation had not been approved. The letter recites the hospital's voluntary abandonment policy, and then states:

> Your employment status is considered terminated under grounds of voluntary resignation (job abandonment). However, since the organization has been provided with conflicting stories regarding the true nature of your absence, I will be glad to review your situation with you at any time should you feel the decision made was erroneous. If you have any questions or wish to discuss this matter, please call me . . . .
>
> Since you have not returned from vacation I am accepting your voluntary resignation. If you are able to give appropriate medical documentation substantiating you were unable to work due to illness, I will re-evaluate the resignation.

In response to the letter of August 9, 2000, plaintiff did not forward Piekielny copies of any medical documentation concerning her illness. Plaintiff did, however, submit a doctor's note from August 11, 2000 diagnosing her with German Measles and giving her a return-to-work date of August 12, 2000 in response to this motion for summary judgment.

Plaintiff filed a third charge with the EEOC on or about August 25, 2000, and a notice of right to sue with respect to that charge was issued on September 15, 2000. On August 11, 2000,

plaintiff filed a first amended complaint. On September 22, 2000, plaintiff filed a second amended complaint, adding a claim for retaliation under Title VII stemming from her termination.

V.    Treatment of Non-Hispanic Workers

Plaintiff presented the following evidence of non-Mexican-American mental health workers being treated more favorably than she. First, plaintiff testified that she often saw an African-American employee arrive late for work, and that he was not disciplined according to hospital policy. In response to that argument, defendant submitted an affidavit of Loisel stating that the African-American employee in question had, in fact, been disciplined for tardiness and absences on seven occasions between January 11, 2000 and July 10, 2000.

Sylvia Castillo testified that Amezcua publicly reprimanded plaintiff for being late on one occasion, and that she did not publicly reprimand any other employees when they came in late. Plaintiff maintains that this action was contrary to hospital policy which states: "the manager has a private discussion with the employee in a formal manner." Castillo also testified to one occasion where Amezcua reprimanded plaintiff for bringing coffee into the unit, and that she did not reprimand non-Mexican-American employees for the same behavior. Castillo testified that she did not observe Amezcua treat other Mexican-American employees the way she treated plaintiff.

Plaintiff also testified that Amezcua issued a memorandum which stated that mental health workers could not have a nurse fill in for them when requesting a day off, but that Amezcua allowed a Caucasian mental health worker to be replaced by a nurse when she took the day off. When plaintiff requested a day off, she was informed that she would have to wait until the next day to see if there would be a low census. The next day, plaintiff was in fact given the day off, as requested.

Plaintiff testified that with regard to her discipline for failing to properly conduct a security

round, other employees were not disciplined for not following policy regarding security checks. For example, despite a policy which states that "every effort shall be made for security rounds to be conducted by two staff members," an African-American employee was not disciplined for conducting a security round by himself. Plaintiff was disciplined for leaving a door unlocked, despite marking her security check as complete, not for doing the check alone.

On December 5, 1996, plaintiff claims that Amezcua called her a "nasty person" and mimicked her body movements. Plaintiff also claims that Amezcua stated to her in January, 2000 that "Mexicans start trouble," and that she told Loisel of the comment. Plaintiff testified that Loisel responded that she would "look into" the incident.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511.

ANALYSIS

I.    <u>National Origin Discrimination Claims</u>

Plaintiff claims that defendant discriminated against her on the basis of her origin, Mexican-American, in violation of Title VII of the Civil Right Act of 1964. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). In order to prevail on a national origin discrimination claim under Title VII, a plaintiff must either offer direct evidence of discrimination or proceed under the <u>McDonnell Douglas</u> burden-shifting method. <u>Smart v. Ball State University</u>, 89 F.3d 437, 439 (7th Cir. 1996); <u>Hiatt v. Rockwell Int'l Corp.</u>, 26 F.3d 761, 767-68 (7th Cir. 1994). Plaintiff does not offer any direct evidence of discrimination, and therefore utilized the <u>McDonnell Douglas</u> burden-shifting framework in response to this motion. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

A.    <u>Prima Facie Case</u>

Under the <u>McDonnell Douglas</u> framework, plaintiff may establish a prima facie case of discrimination based on national origin by showing that: (1) she was a member of a protected class; (2) she was meeting defendant's legitimate performance expectations; (3) she suffered adverse employment action; and (4) defendant treated similarly situated employees outside the protected class more favorably. <u>See</u> <u>Thorn v. Sundstrand Aerospace Corp.</u>, 207 F.3d 383, 386 (7th Cir. 2000). The parties do not dispute whether plaintiff is a member of a protected class, but do dispute the remainder of the prima facie case. Defendant addressed its motion for summary judgment largely to the issue of whether plaintiff was meeting its legitimate expectations. However, this court

14

believes that it is proper to first addresses what, if any, of the actions plaintiff complains of were "adverse employment actions" within the meaning of the law.

1.  Adverse Employment Actions

An employee proceeding under the <u>McDonnell Douglas</u> burden-shifting method must show that she suffered a "materially adverse employment action." The Seventh Circuit has defined the phrase broadly, including readily quantifiable losses such as loss or reduction of pay or monetary benefits, in addition to many other forms of adversity. See <u>Smart v. Ball State University</u>, 89 F.3d 437, 441 (7th Cir. 1996) (citing examples). However, minor or trivial actions that make an employee unhappy are not sufficient to qualify as materially adverse employment actions under the law. <u>See</u> <u>id.</u>

Plaintiff claims that she was "subjected to a continuous course if discriminatory treatment on the basis of [her] national origin, Mexican-American, in that similarly situated non-Mexican-American co-workers did not receive the treatment afforded to plaintiff." (2nd Amend. Comp. at ¶ 11.) Plaintiff's discrimination claim in her second amended complaint and response to this motion list a litany of allegedly discriminatory actions, including: (1) the memorandum issued which prohibited employees from speaking Spanish and Amezcua's later alleged threat to terminate plaintiff if she spoke Spanish, (2) plaintiff's "unfounded discipline" for alleged performance deficiencies and threats of termination, (3) Amezcua's derogatory comments such as "Mexicans start trouble," (4) discriminatory scheduling of plaintiff's work hours, (5) plaintiff's complaints to supervisory personnel have been to no avail.

Of those actions about which plaintiff complains, only the 90 day performance probation approaches the definition of materially adverse employment action within the meaning of the law.

15

The remainder of the actions plaintiff complains of are the sort of minor or trivial actions for which Title VII provides no redress. First, the English policy cannot be considered an adverse employment action. With the exception of being threatened with termination, plaintiff provides no support for the idea that the policy affected the terms or conditions of her employment. Plaintiff speaks English, and to the extent the policy was over-broad when it was first announced, the hospital narrowed the policy to make clear that employees were only required to speak English when the conversation concerned the treatment of a patient. As for plaintiff's allegation that she was threatened with termination for speaking Spanish or otherwise, the Seventh Circuit has made clear that a threat of termination is not an employment action at all under the law. See Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) ("If your supervisor tells you that he'll shoot you unless you resign "voluntarily," and you do, that's constructive discharge, though the threat itself is not an employment action of any sort.").[2] The discriminatory comments of which plaintiff complains and management's ignoring her complaints are also not employment actions, much less materially adverse employment actions. Plaintiff has pointed to no adverse employment action with regard to scheduling. Plaintiff did not point to a single instance in which she was denied a request for a day off. Plaintiff's only evidence with regard to scheduling is that a Caucasian employee was allowed to have a nurse cover her shift while plaintiff was told that she would have to wait to see if the day she requested was a low census day. However, it is undisputed that plaintiff was able to take off the

---

[2]Plaintiff does not allege that defendant's pre-termination treatment of her amounted to constructive discharge, nor could she under the undisputed facts. An employee can assert a claim for constructive discharge when she is forced to resign because her working conditions, from the standpoint of the reasonable employee, have become unbearable. Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). Plaintiff does not allege nor present facts suggesting that a reasonable person would have found her working conditions "unbearable."

day she requested. Even if she had not, however, being refused a single request for a day off could not be considered materially adverse under the law.

The discipline plaintiff faced in the form of negative performance reviews and "Step One" "coaching"/ "corrective action" write-ups in her personnel file are also not adverse employment actions under the law of the Seventh Circuit. The Seventh Circuit has repeatedly held that unfavorable performance evaluations alone do not constitute adverse employment actions. See Smart, 89 F.3d at 442; see also Silk v. City of Chicago, 194 F.3d 788, 802-03 (7th Cir. 1999). The Seventh Circuit has also recently held that oral or written reprimands received under a progressive discipline system need not be considered as implicating sufficiently "tangible job consequences" to constitute an independent basis of liability under Title VII. See Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 613 (7th Cir. 2001) (upholding district court's grant of summary judgment and finding that only plaintiff's suspensions and ultimate terminations were adverse employment actions). "Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them." Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998). Here, it is undisputed that plaintiff suffered no tangible job consequences as a result of the coaching and corrective action she received. She was not suspended nor demoted, and lost no time, benefits, or pay as a result of the discipline. As such, the corrective action and coaching plaintiff received prior to her 90-day suspension can in no way be considered "materially adverse employment actions."

A closer question is whether plaintiff's 90 day performance probation can be considered a materially adverse employment action. Though it is a closer call, this court believes that it cannot. It is undisputed that plaintiff suffered no tangible employment consequences in terms of lost pay,

17

time, benefits, or opportunities for promotion as a result of the probation. The only possible materially adverse consequence of the probation is the effect on plaintiff's employment record. As the Seventh Circuit reasoned in <u>Oest</u>, with the benefit of hindsight, it can be said that, in this case, each oral or written reprimand brought plaintiff closer to termination. <u>See</u> 240 F.3d at 613. However, "[s]uch a course was not an inevitable consequence of every reprimand; job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." <u>Id.</u> Finally, as in <u>Oest</u>, plaintiff has not pointed to any immediate consequence of the probation, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities. <u>See id.</u>; <u>cf. Thomsen v. Romeis</u>, 198 F.3d 1022, 1028 (7th Cir. 2000) (holding that the reprimands the plaintiff had received might not, as the plaintiff asserted, lead to future discipline and affect his ability to compete for promotions and concluding that "[t]hese consequences, considered either individually or in conjunction with each other, appear to be somewhat speculative").

In <u>Smart</u>, the Seventh Circuit did find that probation might constitute materially adverse employment action. <u>See</u> 89 F.3d at 442; <u>see also</u> <u>Russell v. Board of Trustees of the University of Illinois at Chicago</u>, 2001 WL 225051, at *4 (7th Cir. Mar. 8, 2001) ("Russell's situation is entirely different, because she experienced an employment action that was avowedly disciplinary, with its attendant consequences for her pay and her permanent employment record."). However, this court finds that the probation at issue here was more like the oral and written reprimands involved in <u>Oest</u> than the discipline contemplated in <u>Smart</u> and discussed in <u>Russell</u>. Here, as in <u>Oest</u>, it is clear from the comments accompanying the probation that the purpose of the "discipline" was not to punish plaintiff for a wrongdoing, but to help her to become a better mental health worker. The deficiencies

18

cited as reasons for the probation were plaintiff's shortcomings in communicating with staff and treating patients, not theft or other misconduct. Cf. Russell, 2001 WL 225051 at *4 ("After maintaining a spotless employment record for 30 years, her record now includes a formal finding that she "falsified" her time records and committed "theft of services." These are not trivial charges, and both UIC and any prospective employer who inquired into her employment history would surely hold them against her when making employment related decisions."). The only immediate consequence of the probation was that plaintiff was watched closely and was required to meet with Goodavish to discuss her problems, a course of conduct aimed at improving plaintiff's ability to be an effective mental health worker. Moreover, plaintiff was taken off of the performance probation because her communication and treatment skills improved. The letter acknowledging the end of plaintiff's probation, also contained in her personnel file, congratulated her, noted that there had been no further complaints from staff or patients, and reminded plaintiff that she needed to continue to work as a team member and to improve her ability to work with patients in a therapeutic manner. While termed a "probation," the undisputed facts demonstrate that plaintiff's performance probation was the sort of "job-related criticism [that] can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." Oest, 240 F.3d at 613.

Accordingly, none of the actions of which plaintiff complains prior to her termination was materially adverse employment actions under the law, and thus cannot form the basis of a prima facie case of national origin discrimination under Title VII. Of course, even if the negative performance evaluations, reprimands, and probation cannot, standing alone, form the basis of a discrimination claim, they can constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute. See Oest, 240

F.3d at 613-14 (citing Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) (explaining that although negative evaluations may not constitute adverse employment actions, they could be used as evidence of discrimination under the right circumstances)).[3]

## 2. Meeting Employer's Legitimate Expectations

If plaintiff's 90 day performance probation was a materially adverse employment action within the meaning of the law, plaintiff still cannot state a prima facie case of employment discrimination unless she can show that she was meeting her employer's legitimate expectations and that other similarly situated employees who are not Mexican-American were treated more favorably. Defendant offered extensive evidence that plaintiff did not meet its legitimate expectations, as documented in plaintiff's employment record of multiple "Stage One" coaching and corrective actions. In response, plaintiff offers her performance evaluations in the "exceeds expectations" range for the years 1991 to 1996, before plaintiff came under the direct supervision of Amezcua. Plaintiff

---

[3]Plaintiff's ultimate termination was, of course, a materially adverse employment action. However, plaintiff's second amended complaint does not claim discrimination on the basis of national origin stemming from her termination. Plaintiff claims only that her termination was retaliation for asserting her rights under Title VII. However, construing plaintiff's allegations in the light most favorable to plaintiff, including her argument that the string of discipline to which she was subjected, ultimately resulting in her termination, was discriminatory, this court will assume that plaintiff intended to include termination within the allegedly discriminatory discipline to which she was subjected. Plaintiff nevertheless cannot state a prima facie case of discrimination stemming from her termination because she has pointed to no other non-Mexican-American employee who was not considered to have "voluntarily resigned" after failing to follow proper call-in procedures for three consecutive days. In addition, as this court finds below, defendant has offered a legitimate, non-discriminatory reason for the termination, and plaintiff has failed to present sufficient evidence that the reason stated was a pretext for discrimination or for retaliation. Plaintiff was offered the opportunity to keep her job by submitting a note from a doctor confirming her illness, but neglected to do so. Amezcua's alleged remark that "Mexicans are trouble" is insufficient to create a genuine dispute that discrimination was the real reason for plaintiff's termination. Amezcua was involved with the termination decision, but was not the ultimate decision maker and the comment was not made in reference to plaintiff's termination.

also offers her performance evaluation for the years 1997-1999, during which she rated in the "meets expectations" range. Plaintiff also submitted letters from several co-employees which state that plaintiff is a "valued worker" and communicates with the staff. That evidence, however, is not sufficient to raise a genuine dispute as to whether plaintiff was meeting her employer's legitimate expectations when she was placed on performance probation. "The critical issue is whether [the plaintiff] was performing well in her job at the time of her termination." Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1263 (7th Cir. 1993). Plaintiff's performance ratings for the years prior to 2000 do not speak to that inquiry. Plaintiff's evaluation in February, 2000 showed that she was failing to meet standards. While plaintiff disputed the accuracy of that evaluation, evidence that plaintiff's peers found her to be an adequate worker does not mean that she was meeting her employer's expectations. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir. 1994) ("The mere submission of materials from a co-worker or supervisor indicating that an employee's performance is satisfactory . . . does not create a material issue of fact."). Plaintiff does not dispute the facts underlying her multiple Step One and Step Two Actions, with the exception of the "linen disposal incident," in which plaintiff explains her reasons for her failure to take out the linen as requested, but does not deny that the incident occurred or that she failed to take out the linen. Plaintiff does not dispute any of the reasons listed in the memorandum accompanying her 90 day suspension, including the failure to treat patients in a therapeutic manner, arguing instead that the incidents were minor infractions of the rules or were somehow excusable. As such, plaintiff has presented evidence that her failure to meet her employer's reasonable expectations should be excused, but not that she was actually meeting those expectations. Accordingly, plaintiff cannot state a prima facie case of discrimination for this reason, as well.

21

### 3. Treated Other Similarly Situated Employees More Favorably

Even if plaintiff's 90 day suspension was a materially adverse employment action, and even if plaintiff could raise a genuine dispute that she was meeting her employer's legitimate expectations, she still cannot survive a motion for summary judgment because she has not presented any evidence that other similarly situated non-Mexican-American employees were not put on performance probation after committing similar disciplinary infractions. Plaintiff did present evidence that other employees were treated more favorably than herself, but none of that evidence concerned the events leading up to her 90 day probation. For example, plaintiff attempted to create a genuine dispute as to how other employees were treated with regard to discipline for tardiness and having coffee in the unit, scheduling of vacation days, and threats of termination. However, this court has already determined that the disciplinary actions relating to those events were not materially adverse employment actions. The evidence is, of course, relevant to whether plaintiff's 90 day performance probation and ultimate termination were pretextual, but does not go to whether similarly situated non-Mexican-American employees were treated more favorably with regard to the 90 day suspension. Plaintiff has presented no evidence of any other employees with documented problems communicating with staff and treating patients in a therapeutic manner who were not put on probation or otherwise disciplined for their actions. Accordingly, plaintiff has not met her burden of creating a genuine dispute of material fact on the elements of her discrimination claim.

### B. Pretext

If plaintiff could create a genuine dispute that her 90 day probation was an adverse employment action, that she was meeting her employer's legitimate expectations, and that other employees not in the protected class were treated more favorably, thus establishing a prima facie

case, the burden shifts to defendant to state a legitimate, non-discriminatory reason for the decision to place plaintiff on probation. See Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 (7th Cir. 1999). If the employer meets this burden of production, it rebuts the presumption of discrimination, see Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994), shifting the burden back to the employee to show that the employer's stated reasons for its action are pretextual. Debs v. Northeastern Illinois University, 153 F.3d 390, 395 (7th Cir. 1998). Pretext means "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995); see also Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000) (to show pretext, plaintiff must present evidence that each of the proffered reasons is either a lie or completely lacking a factual basis).

As stated above, the only employment action which possibly qualifies as "materially adverse" within the meaning of the law is plaintiff's 90 day performance probation. Therefore, defendant need only offer a legitimate, non-discriminatory reason for the probation, which plaintiff has done. Specifically, defendant listed four examples of performance issues in the January 24, 2000 memorandum outlining the reasons for and goals of the probation. Those reasons included: (1) inadequate communication with team members, including one particular incident of failing to tell Amezcua that a patient was to be discharged, (2) failure to complete assignments, including linen disposal on January 11, 2000, (3) speaking to a newly admitted patient in a negative manner and refusing to give him something to eat, resulting in a one-to-one intervention required to calm the patient, and (4) leaving a door unlocked resulting in breech of safety. The Step Three breach of agreement memorandum of April 12, 2000 elaborates and continues those themes, noting plaintiff's problems with team work and non-therapeutic approach to patients.

Plaintiff attempts to rebut these reasons by arguing that she was subjected to a course of conduct which other employees were not. Again, plaintiff attempts to create a genuine dispute by arguing that the incidents leading to the probation were minor or justified. For example, plaintiff states that she did not give the newly-admitted patient something to eat because she was informed that he had already eaten. Plaintiff does not, however, deny that as a result of plaintiff's treatment, the patient grew enraged and another staff member had to engage in a one-on-one intervention in order to calm him. Plaintiff also does not deny any of defendant's other comments regarding plaintiff's problems dealing with patients in a therapeutic manner, including refusing to allow patients to have personal items and an incident in which plaintiff shouted "seizure" when a patient had a seizure while failing to assist the patient and causing the other patients to become frightened. Nor does plaintiff deny that she refused to view patients as customers or have a customer service approach.

Plaintiff does not deny the allegations that she had trouble communicating with staff, accept to deny that she did not refuse to speak with Amezcua (plaintiff contends only that she refused to speak with Amezcua alone). Plaintiff does not deny that numerous other staff members reported problems with plaintiff on an "almost weekly basis" or that she challenged almost everything she was asked to do. Plaintiff also does not deny that a door was found open, resulting in a security breach, after a security check she performed, arguing instead that other employees were not disciplined for doing security checks alone. However, to succeed in showing pretext by showing that other similarly situated employees were not disciplined in the same manner, plaintiff must show that such similarly situated employees were engaged in acts of comparable seriousness. Morrow v.. Wal-Mart Stores, Inc., 152 F.3d 559, 564 (7th Cir. 1998). In short, plaintiff fails to cite to any

evidence suggesting that the stated reasons for her 90 day probation and subsequent "breach of agreement" are not worthy of belief.

Finally, plaintiff's evidence of Amezcua's allegedly discriminatory treatment of her is not sufficient to raise a genuine dispute that Amezcua's stated reasons for disciplining plaintiff were a pretext for national origin discrimination. The closest plaintiff's evidence comes to creating an inference that discrimination was the real reason for plaintiff's probation is Amezcua's alleged comment that "Mexicans are dirty" in January, 2000 and her "you Mexicans" comment in 1996. This evidence, while relevant to the issue of discriminatory intent, does not relate to the employment decision in question. As the Seventh Circuit stated in Smith v. Firestone Tire & Rubber Co., "stray remarks in the work place . . . cannot justify requiring the employer to prove that its hiring or firing or promotion decisions were based on legitimate criteria." 875 F.2d 1325, 1330 (7th Cir. 1989). Such remarks, as offered by the plaintiff, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision maker at issue. Cowan v. Glenbrook Sec. Services, Inc., 123 F.3d 438, 444 (7th Cir. 1997) (collecting cases). Here, plaintiff does not allege that the comments were made in the context of her probation.

Plaintiff's other evidence of disparate treatment also fails to raise a genuine dispute that Amezcua treated plaintiff differently on the basis of her national origin. Plaintiff's evidence that one time Amezcua reprimanded plaintiff for bringing coffee into the unit, and that one time Amezcua publicly reprimanded plaintiff for being late but did not publicly reprimand other employees for being late is insufficient to suggest that Amezcua was motivated by discrimination, rather than the legitimate, non-discriminatory reasons she testified to, several years later when she was involved in

plaintiff's probation. Likewise, plaintiff's own testimony that an African-American employee was not disciplined for tardiness is patently insufficient to create a genuine dispute as to whether Amezcua disciplined other employees differently. Plaintiff never viewed that employee's employment file, and thus has no way of knowing whether the employee was disciplined. In addition, defendant submitted an affidavit showing that the employee was, in fact, disciplined for tardiness on seven occasions in the year 2000. Plaintiff's claim that Amezcua discriminated against her in scheduling likewise lacks support. It is undisputed that plaintiff never requested a day off which she did not receive. That Amezcua told plaintiff she would have to wait to see if the day was a low census day does not show an animus to plaintiff. The same is true of Amezcua's alleged threat to terminate plaintiff's employment if she spoke Spanish while working. The comment was made shortly after a memorandum which legitimately limited the time during which employees could speak languages other than English to when they were not working or discussing patient care.

Finally, while Amezcua referred plaintiff's performance problems to Loisel, Loisel recommended the probation and Goodavish agreed with the decision. Goodavish also did extensive independent investigation of plaintiff's problems and met with plaintiff repeatedly to discuss the issues. It was also Goodavish's decision to find plaintiff in breach of her agreement. Finally, Amezcua and Goodavish together found plaintiff to have successfully completed her performance probation. As such, there is no evidence to suggest that any animus Amezcua may have harbored for Mexican-Americans played a role in plaintiff's probation, should that probation be considered an adverse action.

## II.    Retaliation Claims

Plaintiff states two claims for retaliation, both arising from her complaints to supervisory personnel and filing charges with the EEOC and this court.  Count II alleges retaliation in the form of discriminatory scheduling, a failure to respond to complaints, and heightened discipline, including being placed on 90 day probation.  Count III alleges retaliation in the form of plaintiff's termination for failing to follow procedures for calling in to report her illness.

Section 704 of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  Lacking any direct evidence of retaliatory intent, plaintiff again seeks to fit her claim within the McDonnell Douglas framework.  A prima facie case of retaliation under Title VII requires the plaintiff to present sufficient evidence that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected expression and the adverse action.  Russell v. Board of Trustees of the University of Illinois at Chicago, 2001 WL 225051, at *6 (7th Cir. Mar. 8, 2001).  In order to demonstrate the "causal link," the plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the protected expression.  See Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 479 (7th Cir. 1995).  If the plaintiff gets this far, the defendant must then come forward with a legitimate business reason for taking the employment action; if it does so, the plaintiff may survive summary judgment only by presenting sufficient evidence that the defendant's justification is pretextual.  See Russell, 2001 WL 2250501 at *6.

## A.    Count II: Pre-Termination Events

Count II of Plaintiff's retaliation claims is based upon the same scheduling, discipline, failure to respond to complaints, and termination threats which this court has already determined were not adverse employment actions. Accordingly, the bulk of Count II's retaliation claim fails because plaintiff has not shown that she suffered from materially adverse employment actions within the meaning of the law. As discussed above, the only employment action which might qualify as materially adverse is plaintiff's 90 day performance probation. Plaintiff's claim that her 90 day probation was retaliation for complaining of Amezcua's discriminatory treatment to Loisel or others fails for a different reason. Plaintiff claims that she complained to Loisel about Amezcua, including Amezcua's statement that "Mexicans start trouble" in early January, 2000, and it is undisputed that plaintiff was placed on probation on January 24, 2000. Accordingly, there may be a genuine issue of material fact as to whether there was a causal connection between the complaint and the probation. However, as discussed above, defendant has come forth with extensive legitimate reasons for the probation, and plaintiff has failed to rebut those reasons or create a genuine dispute that the stated reasons are a pretext for discrimination. For the same reasons, and in the absence of any direct evidence of retaliatory intent, plaintiff fails to show that the stated reasons were a pretext for retaliation against her for complaining of national origin discrimination. Accordingly, plaintiff has failed to raise a genuine dispute as to whether her pre-termination discipline was a pretext for retaliation.

## B.    Count III: Retaliation in Termination

Plaintiff's filing of EEOC charges and this lawsuit is undisputedly statutorily protected speech, and her termination is undisputedly an adverse employment action. Plaintiff was terminated

from her employment approximately 20 days after she filed suit in this court, though several months after she first filed charges with the EEOC. Accordingly, there may be a genuine issue of material fact regarding a causal connection between the filing of this suit and her termination. However, plaintiff has failed to create a genuine dispute regarding whether her termination was a pretext for retaliation.

Again, in order to defeat summary judgment on her retaliation claim, plaintiff must create a genuine dispute that the stated reasons for her termination were either a lie or completely lacking a factual basis. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000). Defendant's stated reason for plaintiff's termination is her failure to call in to report her absences in accordance with hospital procedures. Plaintiff attempts to undermine that reason by presenting evidence that she did call in to inform her employer that she would not be returning to work until August 11, 2000, that the hospital's policy does not require employees to call in precisely at the times listed for each shift, but rather either at that time or some time before, and that plaintiff was told that she did not have to keep calling in for every day she was going to miss. Given the ambiguity in the call-in policy and the conflicting testimony regarding what was said during plaintiff's calls, this court would be inclined to agree with plaintiff she had raised a genuine dispute as to whether her termination was a pretext for retaliation if defendant had terminated her employment outright, without giving her an opportunity to explain her absences. Defendant did not do so, however. Instead, the hospital gave plaintiff the opportunity to show proof of her illness and to review its decision.

Under the hospital's vacation policies, plaintiff was not entitled to take any more than two weeks off during the summer. Because plaintiff had already used those two weeks, plaintiff was not permitted to take any days off after her vacation unless she was ill. Plaintiff had a lengthy history

of tardiness and unexcused absences in her personnel file, the accuracy of which she has not disputed in response to this motion. Especially in light of that history, plaintiff's supervisors were justified in questioning the legitimacy of the calls they received and whether plaintiff was merely attempting to extend her vacation. Rather than terminate plaintiff's employment outright, however, Piekielny gave plaintiff an opportunity to negate her "voluntary resignation" and show the hospital that she had not, in fact, abandoned her job. Piekielny's letter stated: "since the organization has been provided with conflicting stories regarding the true nature of your absence, I will be glad to review your situation with you at any time should you feel the decision made was erroneous. If you have any questions or wish to discuss this matter, please call me," and "[i]f you are able to give appropriate medical documentation substantiating you were unable to work due to illness, I will re-evaluate the resignation." Plaintiff did not forward any medical documentation to the hospital in response to Piekielny's letter.

Recognizing the ambiguity and confusion in the circumstances surrounding plaintiff's calls, Piekielny might have waited for plaintiff to return and failed to show medical documentation for her absence before considering plaintiff to have "voluntarily resigned." This court does not view Piekielny's failure to do so as material, however. Piekielny did effectively the same thing: considered plaintiff's employment to be terminated, but gave her the opportunity to "un-do" that decision merely by showing documentation of her illness. In that sense, plaintiff's termination was conditional. Given the fact that the only absence which would have not have been grounds for termination under the hospital's policies was for illness, that condition was perfectly legitimate. Plaintiff chose not to comply with that legitimately-set condition, opting rather to pursue this litigation and submit her doctor's note only in response to this motion. As such, the hospital's

conditional termination became final.

Given the undisputed manner in which the hospital handled plaintiff's termination, including giving plaintiff the opportunity to demonstrate that the hospital was mistaken and plaintiff's refusal to do so, this court cannot conclude that plaintiff's termination was a pretext for retaliation or for national origin discrimination.

## CONCLUSION

For all the reasons stated, defendant's motion for summary judgment is GRANTED. This case is DISMISSED in its entirety. Defendant's motion to strike portions of plaintiff's evidence is MOOT. All other pending motions are MOOT.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN
United States District Judge

DATE: April 3, 2000